# Exhibit A

# OPERATING AGREEMENT

## OF

## 313 BAYVIEW, LLC

## A

## NEW JERSEY
## LIMITED LIABILITY COMPANY

## AS OF NOVEMBER 2, 2016

**Prepared by:**

**THE CASE LAW FIRM, PC**

**707 Cinnamon Lane**
**Franklin Lakes, NJ 07417**

# Limited Liability Company Operating Agreement
# for
# 313 Bayview, LLC

This Limited Liability Company Operating Agreement of **313 Bayview, LLC**, a limited liability company organized pursuant to the New Jersey Limited Liability Company Law, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement.

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1     **Act.**   The New Jersey Limited Liability Company Law and all amendments to the Act.

1.2     **Additional Contribution.**  An additional Capital Contribution payable by the Members to the Company pursuant to Article VIII.

1.3     **Agreement.**   This Limited Liability Company Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

1.4     **Articles.**  The Articles of Organization of the Company, as amended from time to time, and filed with the Department of State of New Jersey.

1.5     **Assignee.**   A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.6     **Bankrupt Person.**  A Person who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code by voluntary or involuntary petition, or (2) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation, arrangement, composition, readjustment, dissolution, or similar relief.

1.7     **Business Day.**  Any day other than Saturday, Sunday or any legal holiday observed in the State of New Jersey.

1.8     **Capital Account.**  The account maintained for a Member or Assignee determined in accordance with Article VIII.

1.9     **Capital Contribution.**  Any contribution of Property or services made by or on behalf of a Member or Assignee.

1

1.10    **Capital Proceeds.**  The proceeds of any sale, refinance, or other transfer of the Property or upon dissolution of the Company, decreased by (a) cash expenditures for expenses of the Project (except the Excluded Sums as defined in Section 7.4) including the cost of such sale, refinance, transfer or dissolution, (b) reserves for contingencies and working capital except the Excluded Sums), established in such amounts as the Managing Members may reasonably determine, (c) repayment of principal, interest and other amounts due on any financing including Voluntary Loans (excluding the Excluded Sums); and (d) in the case of dissolution, payment of liabilities to creditors in the order of priority as provided by law (including liabilities on account of Voluntary Loans but excluding liabilities on account of Members' Capital Contributions).

1.11    **Cash Proceeds.**  With respect to any fiscal period of the Company, cash received from all sources including without limitation, Capital Contributions, proceeds from construction financing requisitions and other loan proceeds, other than Capital Proceeds, decreased by (a) permitted cash expenditures for expenses of the Project (except for the Excluded Sums), (b) permitted capital expenditures (except the Excluded Sums) to the extent not made from reserves, (c) reserves for contingencies and working capital (except the Excluded Sums), established in such amounts as the Managing Members may reasonably determine, (d) repayment of principal upon the Purchase Money Loan, (e) repayment of principal, interest and other amounts due on any Voluntary Loans and (e) taxes, escrows for taxes and other governmental or quasi-governmental assessments or charges paid by the Company.

1.12    **Commitment.**  The Capital Contributions that a Member is obligated to make pursuant to the terms of this Agreement, including a Member's Initial Capital Contributions and any Additional Contribution of a Member.

1.13    **Company.**  313 Bayview, LLC, a limited liability company formed under the laws of New Jersey, and any successor limited liability company.

1.14    **Consent of the Managing Members.**  An affirmative vote of the Managing Members holding a majority of the Managing Members' voting interests.  For purposes of the consent provisions, the Managing Members' voting interests shall be as follows:

Atlantic Property Development, LLC                    100%

1.15    **Consent of the Members.**  An affirmative vote of the Members owning one hundred percent (100%) of the Units and memorialized in an instrument signed by each of them.

1.16    **Construction Cost**. All costs to entitle the Real Property (if applicable), design, plan, engineer and construct a single family residence of approximately 1350 square feet thereon, and install all utilities, irrigation and landscaping thereon, inclusive

2

of all and all labor, materials, services, permits, other governmental approvals, utility connections contractor overhead, construction insurance, punch list items, final unconditional lien waivers, and all other improvements required or desirable to position the Real Property for resale, which costs, for purposes of this Agreement, shall be deemed to the fixed sum of Two Hundred Forty-Five Thousand Dollars ($260,300.00).

1.17   **Delinquent Member.**   A Member who has failed to meet the Commitment of that Member after written notice and an opportunity to cure as provided in this Agreement.

1.18   **Disposition (Dispose).** Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.19   **Dissolution Event.**   An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.20   **Distribution.**   A transfer of Property to a Member on account of a Membership Interest as described in Article XI.

1.21   **Effective Date.**  October ___, 2016.

1.22   **Fiscal Year.**  The calendar year.

1.23   **Initial Capital Contribution.**   The Capital Contribution agreed to be made by the Members as described in Article VIII.

1.24   **Management Right.**   The right of a Member to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

1.25   **Managing Members.**  A Member (or the Members) selected to manage the affairs of the Company under Article VII hereof.

1.26   **Member.**  A Person executing the Agreement as a Managing Member or a Non-Managing Member.

1.27   **Membership Interest.**   The rights of a Member to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and, to the extent permitted by this Agreement, to possess and exercise Management Rights.

1.28   **Net Capital.**  The sum of Initial Capital Contributions and Additional Contributions less distributions constituting a return of capital.

1.29   **Non-Managing Member**.  IFMK Realty II, LLC

1.30     **Organization.**  A Person other than a natural person, including without limitation corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, business trusts and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.31     **Person.**  An individual, trust, estate, or any Organization permitted to be a member of a limited liability company under the laws of the State of New Jersey.

1.32     **Preferred Return.**   INTENTIONALLY DELETED.

1.33     **Principal Office.**  The Principal Office of the Company set forth in Section 2.6.

1.34     **Proceeding.**  Any administrative, judicial, or other adversary proceeding, including without limitation litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

1.35     **Project**. The entitlement of the Real Property (if applicable), construction of a single family residence of approximately 1350 square feet thereon and installation of utilities, irrigation and landscaping thereon, inclusive of all labor, materials, services, permits, other governmental approvals, utility connections contractor overhead, construction insurance, punch list items, final unconditional lien waivers, and all other improvements required or desirable to position the Real Property for resale, pursuant to the budget attached hereto as Exhibit A and incorporated herein.

1.36     **Property.**  Any personal property,  tangible or intangible, including money, and any legal or equitable interest in such property owned by the Company, but excluding services and promises to perform services in the future.

1.37     **Real Property**.  That certain real property commonly known as 313 West Bay View Drive,  Lavallette, NJ 08735, and any legal or equitable interest therein.

1.38     **Schedule A.**  Schedule A to this Agreement setting forth the name, address, Initial Capital Contribution, number of Units, and Sharing Ratio to date.

1.39     **Sharing Ratio.**  The Sharing Ratio of each Member is set forth in Schedule A hereof, and Schedule A shall be amended as necessary to conform to any changes thereof agreed to by the Members.  In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.40     **Substitute Member.**  An Assignee who has been admitted to all of the rights of membership pursuant to Section 11.4 of the Agreement.

1.41   **Tax Characterization and Additional Tax Terms.**   It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes.  For such purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Section 8.4 and the provisions of Article IX) and in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively.  In addition, the following terms shall have the following meanings:

(a)   Adjusted Capital Account Deficit shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)   Credit to such Capital Account the minimum gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations; and

(ii)   Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations and shall be interpreted consistently therewith.

(b)   Code shall mean the Internal Revenue Code of 1986 as amended from time to time.

(c)   Nonrecourse Deductions has the meaning set forth in Section 1.704-2(b)(1) of the Tax Regulations.

(d)   Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the Tax Regulations.

(e)   Partner Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of the Tax Regulations.

(f)   Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Tax Regulations.

(g)   Partner Nonrecourse Deductions has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Tax Regulations.

(h)    Partnership Minimum Gain has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Tax Regulations.

(i)    Profits and Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.37(i) shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.37(i), shall be subtracted from such taxable income or loss;

(iii)    Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 9.4 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Section 9.4 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j)    Tax Regulations shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time.  All references herein to a specific section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulations.

1.42    **Unit.**  One of the 1000 units of Membership Interest that are authorized to be issued under this Agreement.  Each Unit represents a 1% Membership Interest with an Sharing Ratio of one (1) %, subject to adjustment as provided herein.  A Unit is divisible into fractional parts.  Voting, the granting or withholding of consents or approvals, and allocation of Profits and Losses and Distributions shall be made pursuant to the applicable provisions of this Agreement with reference to the number of Units held by Members.

## ARTICLE II.
## FORMATION

2.1     **Organization.**  The Members hereby organize the Company as a New Jersey limited liability company pursuant to the provisions of the Act.

2.2     **Agreement.**  For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Agreement hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended.  It is the express intention of the Members that the Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Tax Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule.   To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3     **Name.**  The name of the Company is **313 Bayview, LLC**, and all business of the Company shall be conducted under that name.

2.4     **Term.**  The Company shall continue in existence in perpetuity until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act and the Agreement.  The Managing Members are hereby authorized to execute and file such documents as the determine are necessary and appropriate, including an amendment to the Articles, to effectuate the foregoing.

2.5     **Registered Agent and Office.**  The registered agent for the service of process and the registered office shall be that Person and location reflected in the Articles.  The Managing Members, may, from time to time, change the registered agent or office through appropriate filings with the Department of State of New Jersey.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Members shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.  If the Managing Members shall fail to designate a replacement registered agent or change of address of the registered office, any Member may designate a replacement registered agent or file a notice of change of address.

2.6     **Principal Office.**  The Principal Office of the Company shall be located c/o Atlantic Property Development, LLC, 116 Village Boulevard, Suite 200, Princeton, NJ 08540.

## ARTICLE III.
## PURPOSE; NATURE OF BUSINESS

3.1     The business purpose of the Company is to purchase, acquire, develop, construct, lease, finance, renovate, rehabilitate, sell, transfer, and dispose of the Real Property to a newly constructed and landscaped single family home of approximately 1350 square feet subject to approval from the municipality, refinance, and otherwise exploit for profit the Real Property, and to engage in any and all other business activities reasonably necessary in connection therewith.  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III.

## ARTICLE IV.
## ACCOUNTING AND RECORDS

4.1     **Records to be Maintained.**  The Company shall maintain the following records at the Principal Office:

(a)     a current list of the full name set forth in alphabetical order and last known mailing address of each Member, together with the information set forth on Schedule A relating to each Member's Capital Contributions, number of Units and Sharing Ratios;

(b)     a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any such amendment has been executed;

(c)     a copy of the Company's federal, state and local income or information tax returns and reports for the three most recent Fiscal Years;

(d)     a copy of this Agreement including all amendments thereto;

(e)     copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property, or services;

(f)     copies of financial statements of the Company for the three most recent years;

(g)     minutes of any meeting for which minutes were taken;

(h)     written consents obtained from Members for actions taken by Members without a meeting; and

(i)     the Company's books and records, including financial statements of the Company and all other reports or other information prepared and delivered by the managing agent

for the Company, which shall be kept, and the final financial position and results of its operations recorded, in accordance with the accounting methods elected to be followed by the Managing Members on behalf of the Company for federal income tax purposes, and which shall be open to inspections and copying by the Members or their agents at reasonable times.

4.2     **Tax Returns and Reports.**   The Managing Members, at Company expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and shall prepare and deliver to each Member, within ninety (90) days after the expiration of each Fiscal Year, and at Company expense, all information returns and reports required and reports by the Code and Tax Regulations and Company information necessary for the preparation of the Members' federal income tax returns.

ARTICLE V.
**NAMES AND ADDRESSES OF MEMBERS**

The names and addresses of the Members are as stated on Schedule A.

ARTICLE VI.
**RIGHTS AND DUTIES OF MEMBERS**

6.1     **Management Rights.**   No Member other than the Managing Members shall have authority to bind the Company. Notwithstanding the foregoing, the following actions shall require the Consent of the Members after written notice from the Managing Members to the Members requesting the same:

(a)     any amendment to the Agreement or to the Articles;

(b)     the merger or consolidation of the Company with any other Person;

(c)     the continuation of the Company after a Dissolution Event;

(d)     the admission of a new Member, except as provided for in Section 11 hereof;

(e)     the requirement that Additional Contributions be made other than as expressly set forth herein;

(f)     for the taking of any voluntary action which would serve to terminate, dissolve or bankrupt the Company, or render the Company insolvent;

(g)     financing, additional financing, refinancing and/or prepayment of any existing mortgage, including but not limited to the Purchase Money Loan and/or any Voluntary Loan;

(h)     any transaction between any Member, or any of its affiliates, and

the Company; and

> (i)    any loan of the Company's funds.

6.2    **Amendment**.   Notwithstanding the foregoing, no amendment to the Agreement and/or the Articles that materially adversely affects a Member's financial or beneficial ownership interest in the Company and/or its rights under the Agreement and/or the Articles and/or materially increases its obligations under the Agreement and/or the Articles shall be effective without the prior written consent of such Member.

6.3    **Liability of Members.**   Except as required under the Act or as expressly set forth in this Agreement, No Member shall be personally liable for any debt, obligation, or liability of the Company, whether the liability or obligation arises in contract, tort or otherwise by reason of being a Member.

6.4    **Indemnification.**   A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member on behalf of the Company. The Company shall indemnify, pay, protect and hold harmless any Member (on demand and to the satisfaction of the Member) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever in any way relating to any agreement, liability, commitment, expense or obligation of the Company which may be imposed on, incurred by, or asserted against the Member solely as a result of such Member being a Member (including, without limitation, all reasonable costs and expenses of defense, appeal and settlement of any and all suits, actions or proceedings instituted against the Member and all costs of investigation in connection therewith).  The satisfaction of the obligations of the Company under this Section 6.4 shall be from and limited to the assets of the Company and no Member shall have any personal liability on account thereof. The foregoing rights of indemnification are in addition to and shall not be a limitation of any rights that may be provided in the Act.

6.5    **Representations and Warranties.**   Each Member, and in the case of a trust or other entity, the person(s) executing the Agreement on behalf of the entity, hereby represents and warrants to the Company and each other Member that: (a) if that Member is an entity, it has power to enter into the Agreement and to perform its obligations hereunder and that the person(s) executing the Agreement on behalf of the entity has the power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.6     **Conflicts of Interest.**

(a)     A Member, including a Managing Member, shall be entitled to enter into transactions that may be considered to be: (i) competitive with the Company, and (ii) similar to the transactions into which the Company may enter.  Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any Property, profit, or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business (including without limitation the acceptance of any rebate, gift, kickback or other consideration from any third party in respect of goods sold or services rendered to the Company), and/or from a use or appropriation by the Member of Company Property including information developed exclusively for the Company and opportunities expressly offered to the Company.  No Member or a principal of Member shall be permitted to purchase any mortgage encumbering the Property for the purpose of foreclosing said mortgage against the Company.

(b)     A Member, including a Managing Member, does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest.  With the Consent of the Members, a Member may lend money to and transact other business with the Company.  Except as provided in this Agreement, the rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company and is made with the Consent of the Members.

6.7     **Patriot Act Representations**.  Each Member represents and warrants as follows:

(a)     To the best knowledge of Member, neither Member nor any of its constituents or Affiliates is a Prohibited Person.

(b)     Neither Member, nor any of its constituents or Affiliates, (i) has conducted or will conduct any business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) has dealt or will deal in, or otherwise has engaged or will engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (iii) has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(c)     Member covenants and agrees to deliver to the Company or any lender any certification or other evidence requested from time to time by the Company or any lender confirming Borrower's compliance with this Section 6.7.

11

(d) Definitions.  For the purposes of this Section 6.7 only, and unless the context clearly indicates otherwise, the following terms shall have the following meanings:

(i) "**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than ten percent (10%) of, is in control of, is controlled by or is under common ownership or control with such Person or is a director or officer of such Person or of an Affiliate of such Person.  As used in this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

(ii) "**Executive Order**" shall have the meaning set forth in the definition of "**Prohibited Person**".

(iii) "**Patriot Act**" shall mean collectively all laws relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as same may be amended or modified.

(iv) "**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(v) "**Prohibited Person**" shall mean any Person:

(A) listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(B) that is owned or controlled by, or acting for or on behalf of, any Person or entity that is listed in the Annex to, or is otherwise subject to the provisions of the Executive Order;

(C) with whom an institutional lender would be prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Law, including the Executive Order;

(D) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(E) that is named as a "specially designated national and

12

blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(F) who is an Affiliate of a Person listed above.

ARTICLE VII.
**MANAGING MEMBERS**

7.1     **Managing Members.** Except as otherwise provided in the Agreement, the management of the Company and all decisions concerning the business affairs of the Company shall be made by the Managing Members.  The Managing Members shall be:

Atlantic Property Development, LLC

7.2     **Term of Office as Managing Members.**  Each Managing Member shall serve until (i) the Dissociation of such Managing Member; or (ii) any removal of such Managing Member pursuant to Section 7.7.

7.3     **Authority of Managing Members to Bind the Company.**  Only the Managing Members and authorized agents of the Company shall have the authority to bind the Company. Except for the specific matters requiring the Consent of the Members pursuant to Section 6.1, the Managing Members have the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company (as described in Article III), including, without limitation:

(a)     the institution, prosecution, and defense of any Proceeding in the Company's name;

(b)     the purchase, receipt, lease or other acquisition, ownership, holding, development, improvement, use and other dealing with the Property;

(c)     the entering into of contracts and guaranties, incurring of liabilities; borrowing of money, issuance of notes, bonds and other obligations, and the securing of any of its obligations by mortgage or pledge of any of its Property or income[1];

(d)     the investment and reinvestment of the Company's funds, and receipt and holding of Property as security for repayment;

(f)     the conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company;

(g)     the hiring and appointment of employees and agents of the Company, the defining of their duties and the establishment of their compensation, and the dealing with

---

[1] Subject to the provisions of Section 7.4, Members' cooperation in the execution of certain documents related thereto maybe required from time to time and shall not be unreasonably withheld or delayed.

tradespeople, accountants and attorneys, on such terms as the Managing Members shall reasonably determine;

(h)     the purchase of liability and other insurance to protect the Company's business and Property;

(i)     the indemnification of any Person;

(j)     the establishment of reserve funds of the Company to provide for future requirements for operations, contingencies or any other purpose that the Managing Members deems reasonably necessary or appropriate;   and

(k)     the making of such elections under the Code and Tax Regulations and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Managing Members deem reasonably necessary or appropriate, including without limitation, elections referred to in Section 754 of the Code, the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company.

7.4     All Managing Members of the LLC are required to submit documents and execute all necessary paperwork in order for the Company to obtain  a loan to finance the purchase of the subject premises (the "**Purchase Money Loan**") and any other loan, and if required by the lender, the Non-Managing Member shall execute the mortgage, and any other documents reasonably requested by the Lender,securing the Purchase Money Loan on behalf of the Company (but not individually) along with the Managing Member; provided that neither Non-Managing Member nor any of its principals shall sign any promissory note, loan agreement, any other loan document and/or any other contract and/or guaranty the Company's payment and/or performance thereunder. Notwithstanding anything in this Agreement to the contrary, (a) the Managing Members will be solely responsible for the payment out of their own funds of (i) all interest due on the Purchase Money Loan, (ii) all costs (including but not limited to all application fees, credit report fees, points, mortgage taxes, attorney fees, escrow fees, title insurance premiums, recording fees, and any and all closing costs) associated with the Purchase Money Loan, (iii) all Construction Cost Overruns, and (iv) all cash flow needs of the Company if the Purchase Money Loan matures and the Real Property cannot be rented (collectively, the "Excluded Sums"), (b) the Company will not reimburse the Managing Members for payment of the Excluded Sums, and (c) such payments shall not constitute Capital Contributions of the Managing Members.  Principal payments on the Purchase Money Loan will not be deducted from the Company's gross receipts when calculating distributions under this Agreement, as the same are considered the Initial Contribution of the Managing Members.

**7.5  Compensation of Managing Members.**  The Managing Members shall not receive a salary, fees or other compensation but shall be reimbursed for all reasonable out-of-pocket expenses paid to unaffiliated third parties in managing the Company (unless resulting from the gross negligence, fraud, bad faith or willful misconduct of a

Managing Member or the breach of this Agreement by a Managing Member). The Managing Members shall not be required to devote full time to the management of the Company business, but only so much time as shall be necessary or appropriate for the proper management of such business of the Company.

**7.6 Managing Member's Standard of Care.** Each Managing Member shall discharge the Managing Member's duties to the Company and the other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances. In discharging its duties, a Managing Members shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Managing Members reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company (unless any Managing Member has knowledge concerning the matter that would cause such reliance to be unwarranted), including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid. The Company shall indemnify and hold harmless each Managing Member against any loss, damage or expense (including attorneys' fees) incurred by the Managing Members as a result of any act performed or omitted on behalf of the Company, or in furtherance of the Company's interests. This indemnity shall not extend to liability of the Managing Members for failure to perform his or her duties in accordance with the standards and duties set forth herein. The satisfaction of any indemnification and any holding harmless shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

**7.7 Resignation; Removal of Managing Members.** The Managing Members shall have a right to resign and may be removed by the unanimous vote of the Non-Managing Members for fraud, misfeasance, breach of fiduciary duty, self dealing, breach of the Managing Member's standard of care as described in Section 7.6 or breach of any other obligation of the Managing Member under this Agreement.

**7.8 Transfer of Management of Company**. Notwithstanding the foregoing, theManaging Member of the Company shall have the right to transfer its duties and responsibilities as a Managing Member without the affirmative vote of Members holding at least seventy percent (70%) of the Membership Interests.

ARTICLE VIII.
**CONTRIBUTIONS AND CAPITAL ACCOUNTS**

8.1    **Initial Capital Contributions**. The Members have agreed to make the Initial Capital Contributions described for that Member on Schedule A. Each Member shall make the Initial Capital Contribution simultaneously with such Member's execution of this Agreement, except as otherwise indicated on Schedule A, and shall receive the number of Units of Membership Interest and Sharing Ratio described for that Member on

Schedule A.  The Managing Members may, at their option, issue certificates representing the Units subscribed for by the Members.  No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.

8.2    **Additional Capital Contributions.**    Notwithstanding the foregoing, Members shall be responsible for making any Additional Contributions to the Company beyond those described on Schedule A for any reason except to fund Excluded Sums (which Excluded Sums the Managing Members are obligated to pay without such payments being deemed Additional Contributions) ("Required Capital").").  In the event that the Managing Members need to raise the Required Capital, they shall give notice thereof to the Members along with detailed information as to the intended uses of such Additional Contributions and each Member shall pay its pro rata portion thereof within ten (10) business days from the date that such notice is delivered to each Member.

8.3    **Enforcement of Commitments**.  In the event any Member (a "Delinquent Member") fails to pay its Initial Capital Contribution and/or any Additional Contribution that it is obligated to make (each, a "Commitment"), the Managing Members shall give the Delinquent Member a notice of such failure, or if the Managing Members are the Delinquent Members, the Non-Managing Member shall give the Delinquent Members a notice of such failure.  If the Delinquent Member fails to perform the Commitment within ten (10) Business Days of the giving of such notice, the Managing Members or the Non-Managing Member, as applicable, may take such action as they deem reasonably appropriate, including but not limited to enforcing the Commitment through arbitration pursuant to Section 13.12 below.  Each Member expressly agrees to the jurisdiction of such arbitrators for purposes of such enforcement.

8.4    **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704.1(b)(2)(iv) of the Tax Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)    To each Member's Capital Account there shall be credited (i) the amount of money contributed from time to time by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations); (ii) the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

(b)    To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of property distributed to such Member (net of liabilities secured by

16

such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

(c)    The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(d)    In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. Because the Members intend that Capital Accounts be maintained in accordance with the Code, the Tax Regulations and applicable law, to accomplish that purpose and for no other reason, the Managing Members may modify the manner in which the Capital Accounts are maintained and adjustments thereto are computed, and may make any appropriate adjustments thereto, to assure such compliance; provided, however, that such modifications and adjustments shall not materially alter the economic agreement between or among the Members.

8.5    **No Obligation to Restore Deficit Balance**.  Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

8.6    **Withdrawal; Successors.**  A Member shall not be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement, and no Member shall be entitled to make any capital contribution to the Company other than as expressly set forth above.   Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired.

8.7    **Interest.**  No Member shall be entitled to interest on such Member's Capital Contributions or on any Profits retained by the Company.

8.8    **Investment of Capital Contributions.**  The Capital Contributions of the Members shall be held in  trust by the settlement agent prior to closing of title and any remainder transferred to the Company's Operating Account and used  by the Managing Members for Company purposes.

8.9    **Voluntary Loans.**  If deemed necessary by the Managing Members to

meet cash requirements of the Company other than the Excluded Sums, the Company, with the Consent of the Members as to the terms, conditions and purposes thereof, may borrow money from one or more Members and/or any other lender.  No such loan (a "Voluntary Loan") shall be deemed an additional contribution of capital but shall be a debt obligation of the Company to be repaid from Cash Proceeds, prior to any distributions to Members.

8.10   **No Personal Liability.**  The Members shall have no personal liability for the repayment of any Capital Contributions of any Member or for any obligations of the Company, provided that if any lender to the Company or vendor of the Company requires a personal guaranty, the Managing Members shall execute and deliver such guaranty.


ARTICLE IX.
**DISTRIBUTIONS AND ALLOCATIONS**

9.1   **Distributions in General.**  From time to time, but not less often than yearly, the Managing Members shall determine the amount, if any, by which the Company funds then on hand exceed the reasonable working capital needs of the Company, including reasonable reserves for future Company obligations excluding the Excluded Sums. Any excess funds shall be distributed to the Members in accordance with the provisions of this Article IX.

9.2   **Distribution of Cash Proceeds**.  Except as otherwise provided in Section 9.4, and subject to the tax distribution set forth in Section 9.3, Cash Proceeds for any particular period shall be distributed to the Members in the following order of priority:

(a)   first, to the Members, pro-rata in accordance with their Sharing Ratios on Schedule A.

9.3   **Tax Distribution**.  Except as otherwise provided in Section 9.4, and provided that no distribution shall be made which will cause or increase an Adjusted Capital Account Deficit for a Member, the Company shall distribute (to the extent that sufficient funds exist after provision for Company expenses and reserves in the reasonable opinion of the Managing Members pursuant to Section 9.2) no less than the Tax Distribution Amount (as defined below) pursuant to Section 9.2(b) no later than ninety (90) days after the close of each Fiscal Year.  The "Tax Distribution Amount" shall be determined for each Fiscal Year by: (A) multiplying the Marginal Tax Rate (as defined below) for that Fiscal Year by the taxable income of the Company (as determined under Code Section 703(a)) for that Fiscal Year, and subtracting (B) the sum of all other distributions with respect to such Fiscal Year. The "Marginal Tax Rate" for any particular Fiscal Year shall be the highest tax rate that would be imposed on any Member under either Section 1 or 11 of the Code, whichever is higher, for that Fiscal Year.

9.4   **Distribution of Capital Proceeds.**  After payment of liabilities to creditors in the order of priority as provided by law (including liabilities on account of

18

Voluntary Loans but excluding liabilities on account of Members' Capital Contributions), Capital Proceeds of the Company shall be distributed to the Members in the following order of priority**:**

      (a)    first, to IFMK Realty II, LLC and then to the Managing Members, pro-rata in accordance with their Sharing Ratios on Schedule A.

      9.5    **Profits, Losses and Distributive Shares of Tax Items**.  Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

      (a)    **<u>Profits</u>**.  After giving effect to the special allocations set forth in this Section, Profits for any Fiscal Year shall be allocated in the following order of priority:

      (i)    First, to the Members, if any, who received any allocation of Losses under Section 9.5(b), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 9.5(b) for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Members pursuant to this Section 9.5(a) for all prior Fiscal Years;

      (ii)    Second, the balance of the Profits remaining, if any, among the Members, pro rata, in proportion to their respective Sharing Ratios.

      (b)    **<u>Losses</u>.**  After giving effect to the special allocations set forth in this Section, Losses shall be allocated as set forth in Section 9.5(b)(i), subject to the limitation in Section 9.5(b)(ii) below, and, if applicable, as provided in Section 9.5(b)(iii).

      (i)    Losses for any Fiscal Year shall be allocated among the Members in proportion to their respective Sharing Ratios.

      (ii)    The Losses allocated pursuant to Section 9.5(b) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.5(b) hereof, the limitation set forth in this Section 9.5(b)(ii) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704 1(b)(2)(ii)(d) of the Tax Regulations.

      (iii)    In the event that there are any remaining Losses in excess of the limitations set forth in Section 9.5(b)(i) or (ii), such remaining Losses shall be allocated among the Members in proportion to their respective Sharing Ratios.

(c)    **Special Allocations.**  The following special allocations will be made in the following order and priority before allocations of Profits and Losses:

(1)    **Partnership Minimum Gain Chargeback.**  If there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, before any other allocation under this Agreement, each Member will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be allocated will be determined in accordance with Regulations Section 1.704-2(g). This Section 9.5(c)(1) is intended to comply with the Partnership Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(2)    **Partner Nonrecourse Debt Minimum Gain Chargeback.**  Notwithstanding any other provision of this Section 9.5 (other than Section 9.5(c)(1) which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Member with a share of such Partner Nonrecourse Debt Minimum Gain (determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the year will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in an amount equal to such Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be so allocated will be determined in accordance with Regulations Section 1.704-2(g). This Section 9.5(c)(2) is intended to comply with the Partner Nonrecourse Debt Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(3)    **Qualified Income offset.**  A Member who unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-l(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

(4)    **Nonrecourse Deductions.**  Nonrecourse Deductions for any Fiscal Year or other period for which allocations are made will be allocated among the Members in proportion to their respective Capital Sharing Ratios in the Company.

(5)     **Partner Nonrecourse Deductions.**     Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any Fiscal  Year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

(6)     **Code Section 754 Adjustments.**     To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulations Section 1.704-1(b)(2(iv)(m).

(d)     **Curative Allocations.** The allocations set forth in Section 9.5(c) (the **"Regulatory Allocations"**) are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may effect results which would be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Managing Member is authorized to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero. The Managing Members will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Regulations; provided, however, that the foregoing shall not materially alter the economic agreement between or among the Members.

(e)     **Tax Allocations-Code Section 704(c).**  For federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each Fiscal Year shall be allocated to and among the Members to reflect the allocations made pursuant to the provisions of this Section 9.5 for such Fiscal Year. In accordance with Code Section 704(c) and the related Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Gross Asset Value of the property (computed in accordance with Section 704). If the Gross Asset Value of any Company asset is adjusted under Section 704, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Regulations. Any elections or other decisions relating to allocations under this Section 9.5(e) will be made in any manner that the Managing Members determines reasonably reflects the purpose and intention of this Agreement. Allocations under this Section 9.5(e) are solely for purposes of federal, state and local

taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions under any provision of this Agreement.

ARTICLE X.
**TAXES**

10.1    **Tax Matters Partner.**  The Managing Members shall be the Tax Matters Partner of the Company pursuant to Section 6231(a)(7) of the Code.  The Tax Matters Partner shall not resign as the Tax Matters Partner unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Partner and such Member has given its consent in writing to its appointment as Tax Matters Partner.  The Tax Matters Partner shall receive no additional compensation from the Company for its services in that capacity, but all reasonable out-of-pocket expenses paid by the Tax Matters Partner in such capacity to unaffiliated third parties shall be borne by the Company.  The Tax Matters Partner is authorized to employ such accountants, attorneys and agents as it determines is necessary to or useful in the performance of its duties.  In addition, the Tax Matters Partner shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

10.2    **Mandatory Section 754 Election.**  Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Managing Members, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be.  The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

ARTICLE XI.
**TRANSFER OF MEMBERSHIP INTEREST**

11.1    **Compliance with Securities Laws.**  No Unit of Membership Interest has been registered under the Securities Act of 1933, as amended, or under any applicable state securities laws.  A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Units of Membership Interest, except in accordance with the terms of this Agreement and upon full compliance with the applicable federal and state securities laws.  The Managing Members shall have no obligation to register any Member's Units of Membership Interest under the Securities Act of 1933, as amended, or under any applicable state securities laws, or to make any exemption therefrom available to any Member.

11.2    **Accredited Investor.**   The Members hereby represent and warrant on their own behalf that such Member is at least twenty-one (21) years of age, such Member is an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended, and that such Member has no intention of selling or otherwise transferring or assigning such Member's  Membership Interest, and that such Member is acquiring such Membership Interest for investment purposes only and not with a view to the resale or distribution thereof.

11.3    **Transfer of Economic Interest.**   The right to receive allocations of Profits and Losses and to receive Distributions may not be transferred in whole or in part unless the following terms and conditions have been satisfied:

The transferor shall have:

(a)     assumed all costs incurred by the Company in connection with the transfer;

(b)     furnished the Company with a written opinion of counsel, satisfactory in form and substance to counsel for the Company, that such transfer complies with applicable federal and state securities laws and the Agreement and that such transfer, for federal income tax purposes, will not cause the termination of the Company under Section 708(b) of the Code, cause the Company to be treated as an association taxable as a corporation for income tax purposes or otherwise adversely affect the Company or the Members; and

(c)     complied with such other conditions as the Managing Members may reasonably require from time to time.

Transfers will be recognized by the Company as effective only upon the close of business on the last day of the calendar month following satisfaction of the above conditions.  Any transfer in contravention of this Article XI and any transfer which if made would cause a termination of the Company for federal income tax purposes under Section 708(b) of the Code shall be void *ab initio* and ineffectual and shall not bind the Company or the other Members.

11.4    **Transfer of Membership Interest and Admission of Substitute Member**. Except for the right to receive allocations of Profits and Losses and to receive Distributions, a Membership Interest of any Member may not be transferred in whole or in part, and a transferee shall not have a right to become a Member unless the following terms and conditions have been satisfied:

(a)     The Managing Members shall have consented in writing to the transfer and substitution, which consent, except as otherwise provided for herein, shall not be unreasonably withheld; provided, however, that in the case of a proposed transfer of the Managing Member's Membership Interest, the Non-Managing Member shall have consented in writing to the transfer and

23

substitution, which consent, except as otherwise provided for herein, shall not be unreasonably withheld;

(b)     The transferee shall have assumed the obligations, if any, of the transferor to the Company, including the obligation to fulfill the *pro rata* portion of the transferor's then existing or subsequently arising Commitment allocable to the transferred Unit of Membership Interest or portion thereof; and

(c)     The transferor and the transferee shall have complied with such other requirements as the Managing Members may reasonably impose (or, in the case of a proposed transfer of the Managing Member's Membership Interest, the the transferee shall have complied with such other requirements as the Non-Managing Member may reasonably impose), including the conditions that the transferee:

(i)     adopt and approve in writing all the terms and provisions of the Agreement then in effect; and

(ii)     pay such reasonable costs incurred by the Company in effecting such substitution.

11.5     **Status of Transferee.**  A transferee of a Unit of Membership Interest who is not a Substitute Member shall be entitled only to receive that share of Profits, Losses and Distributions, and the return of Capital Contribution, to which the transferor would otherwise be entitled with respect to the interest transferred, and shall not have the rights of a Member of the Company under the Act or this Agreement (or Managing Member, as the case may be) including without limitation the right to obtain any information on account of the Company's transactions, to inspect the Company's books or to vote with the Members on, or to grant or withhold consents or approvals of, any matter (or to serve as Managing Member). The Company shall, however, if a transferee and transferor jointly advise the Company in writing of a transfer of the Unit of Membership Interest, furnish the transferee with pertinent tax information at the end of each Fiscal Year.

11.6     **Death, Dissolution, Bankruptcy or Incompetency of a Member**.  Upon the death, dissolution, adjudication of bankruptcy or adjudication of incompetency of a Member (the "Non-Surviving Member"), the surviving Members shall have the option, upon the Consent of the Members, to either: (i) purchase, on a pro rata basis, at fair market value as determined by an independent qualified real estate appraiser selected by the Members (less customary closing costs and adjustments), all of the Membership Interests from the Non-Surviving Member's successors, executors, administrators or legal representatives (as the case may be) or (ii) to permit the Non-Surviving Member's successors, executors, administrators or legal representatives (as the case may be) to retain said Non-Surviving Member's Membership Interests, except that, said successors, executors, administrators or legal representatives (as the case may be) shall not be a Managing Member if the Non-Surviving Member was a Managing Member.

11.7    **Dispositions not in Compliance with this Article Void**.  Any attempted Disposition of a Unit of Membership Interest, or any part thereof, not in compliance with this Article shall be void *ab initio* and ineffectual and shall not bind the Company.

11.8    **Estate Planning Transfers.**  A Member who is an individual may transfer his Interest in the Company during his lifetime or upon his death to a trust for the benefit of his spouse or one or more of his lineal descendants, brothers, sisters or ancestors, or to a partnership or other entity benefiting such persons.  The Transferee, pursuant to a Transfer permitted by this Section 11.8 shall be entitled to become a Member of the Company with respect to the Units of Membership Interests transferred (i) if the Transfer will not result in a termination of the Company under the Code, and (ii) upon (a) delivering to the Members a written instrument evidencing such Transfer; (b) executing a copy of this Agreement accepting and agreeing to all of the terms, conditions and provisions of this Agreement; and (c) paying to the Company its reasonable out-of-pocket costs and expenses incurred in connection with such Transfer and the admission of the Transferee as a Member.

11.9    **Member Transfers**.  Upon the Consent of the Members, a Member may transfer all or any part of his interest in the Company to a then existing Member or Members of the Company, so long as (i) the Transfer will not result in a termination of the Company under the Code, and (ii) upon (a) delivering to the Members a written instrument evidencing such Transfer; and (b) the Member who is acquiring said Member's Interest paying to the Company its reasonable out-of-pocket costs and expenses incurred in connection with such Transfer.

ARTICLE XII.
**DISSOLUTION AND WINDING UP**

12.1    **Dissolution**.  The Company shall be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)    the expiration of the term of the Agreement, unless the Company is continued with the Consent of the Members;

(b)    the Consent of the Members;

(c)    the Dissociation of any Member, unless at the time of such Dissociation there are at least two remaining Members and the Company is continued with the consent of all of the remaining Members within 180 days after such Dissociation;

(d)    when there is but one Member;

(e)    the sale of all of the Company Property, unless replacement property(ies) is acquired pursuant to the terms of this Agreement or upon Consent of the

Members.

     **12.2**   **Effect of Dissolution.**  Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of New Jersey.

     **12.3**   **Distribution of Assets on Dissolution.**  Upon the winding up of the Company, the Managing Members (or, if there is no Managing Member then remaining, such other Person(s) designated by the Members owning at least a majority of the Units) shall employ independent accountants to take and provide to the Members a full account of the assets, liabilities and operations of the Company, shall liquidate the assets (unless the Managing Member or such other Person(s) so designated determines that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in accordance with the provisions of Section 9.4 hereof.

     If at the time of liquidation the Managing Members shall reasonably determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Managing Members may, in order to avoid such loss, defer liquidation with the consent of the Non-Managing Member.

     **12.4**   **Winding Up and Filing Articles of Dissolution.**  Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of New Jersey for filing.  The articles of dissolution shall set forth the information required by the Act.  The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.


ARTICLE XIII.
**SUBSCRIPTION**

     **13.1**     **Subscription Agreement.**  The undersigned hereby subscribes for the number of Units denoted on Schedule A (collectively, the "Units"), of (the "Company"), at a subscription price set by the Managing Member.

     The subscription provisions are submitted by the undersigned Shareholder (the "undersigned") in connection with the proposed issuance of the Units by the Company.  The underlined undersigned understands that the Company will rely upon the representations set forth herein in issuing such Units without registration under the Securities Act of 1933, any other laws as amended, the New Jersey Uniform Securities law, New Jersey securities and real estate statutes or any other applicable state securities law.

The undersigned agrees that this Subscription is and shall be irrevocable, that it may be rejected, in whole or in part, by the Company and that the obligations of the undersigned will terminate if this subscription is not accepted by the undersigned. The undersigned understands that the Company will notify them if this subscription has been rejected for any reason. If this subscription is rejected, the payment tendered by the undersigned will be returned to the undersigned without interest or deduction.

A.   <u>Representations and Warranties.</u>   In connection with the proposed issuance of the Company's Units, the undersigned warrants and represents to the Company the following:

1.   I acknowledge that this offering is being made pursuant to the exemption from registration with the Securities and Exchange Commission (the "SEC") afforded by Sections 3(b) and/or one or all of the relevant provisions in the Securities Act of 1993, as amended from time to time (the "Act"), relating to transactions by an issuer not involving any public offering, and that, if I do not complete this Subscription Agreement accurately and completely, the availability of the exemption for the entire transaction is jeopardized, with resultant substantial economic injury to the Company.  I also acknowledge that the Units may not be registered for sale under the laws of New Jersey, New Jersey or any other state.  I further understand that the Company has no present intention, and is under no obligation, to register the Units under the Act or any applicable state law.

2.   I understand that due to lack of registration, the Units will be restricted securities and that <u>I must bear the economic risk of the investment for an indefinite period</u>.  I further understand that the Units may not be sold, pledged or otherwise disposed of inconsistent with the attached Shareholders' Agreement unless they are registered under the Act and any applicable state securities law, or an exemption from such laws is available and the Company is supplied with an opinion of counsel, satisfactory to the Company, that registration is not required under any such laws and in the opinion of counsel for the Company, such sale, transfer, or pledge will not cause the Company to fail to be in compliance with the exemption provision under which the Units were issued.

3.   I understand that the exemption from registration available in certain circumstances for limited sales of securities pursuant to SEC Rule 144 is not available for sales of the Corporate securities.  Thus, <u>this investment may be less liquid and more indefinite than investments of other restricted securities of other entities</u>.  I further understand that the Company is under no obligation to take any of the steps required to make the shares available for sale inconsistent with Rule 144 or this Agreement.

4.   I have received the Operating Agreement, and have completely reviewed this document.  I <u>have carefully read the Agreement and I fully understand all matters set forth in that document.  No representation has been made to me which is inconsistent with the information contained therein.</u>

5.      I have such knowledge and experience in financial and business affairs that I am fully capable of evaluating each of the merits and risks of this investment.

6.      I AM FULLY ABLE TO BEAR THE ECONOMIC RISK OF THIS INVESTMENT. THE INVESTMENT IS SUITABLE FOR ME IN LIGHT OF MY FINANCIAL POSITION AND INVESTMENT OBJECTIVES AND I FULLY UNDERSTAND THAT THIS INVESTMENT  COULD RESULT IN A  SUBSTANTIAL LOSS RATHER THAN A GAIN OR THE GAIN COULD LESS THAN ANITICIPATED. I RECOGNIZE THAT THIS IS A HIGH-RISK, SPECULATIVE INVESTMENT AND THAT THERE IS NO ASSURANCE THAT ANY RETURN WILL BE RECEIVED THEREON.  I CAN AFFORD A TOTAL LOSS OF THIS INVESTMENT.

7.      The Units are being, and will be, purchased for my own account for investment purposes and not with a view to the resale or distribution thereof by me.

8.      Prior to the date hereof, I have had ample opportunity to ask questions of and receive answers from the Managing Members of the Company concerning the Company and the Company's business and to obtain any additional information which was considered necessary to verify the information supplied to me.

9.      Except as expressly set forth in the Agreement, no representation or warranties have been made to me by the Company.  In entering into this transaction, I am not relying upon any information, other than that contained in such Agreement and the results of my own independent investigation.

10.     I do not require a purchaser representative to assist or advise me in connection with evaluating the risks and merits of the prospective investment.

11.     <u>I am either a citizen, permanent resident alien of the United States, or a domestic limited liability company, duly registered and authorized to conduct business in the State of New Jersey</u>.  The address set forth below is my true and correct residence or business address.

12.     I have been advised that certain information is available to me upon written request prior to entering into this Agreement.  This information may include the cooperative Company's financial disclosures, offering plan or prospectus, seller's tenant payment history and records for the individual apartments to be acquired and any other information that I deem relevant.

13.     I have checked the box or boxes below which describe me.

☐  The undersigned is a natural person whose net worth as of the date hereof (including the net worth of the undersigned's spouse if the undersigned is married) exceeds $1,000,000.

☐ The undersigned is a natural person who had an individual income exceeding $200,000 (or joint income with the undersigned's spouse if the undersigned is married exceeding $300,000) during the previous two tax years and who has reason to believe that during the current year his (or their joint) income will exceed such levels.

☐ The undersigned is a natural person who does not qualify for the above two categories but have fully reviewed the total representations and explanations of risk and nonetheless consent to the various disclosed risks and choose to participate in this venture. My checking of the box to this paragraph precludes my subsequent complaint as to the disclosures, their propriety or sufficiency therewith, subject only to the provisions contained in Section 15.05 of this Agreement.

      B. <u>Indemnification</u>. I acknowledge that I understand the meaning and legal consequences of the representations, warranties and covenants contained above, and I hereby agree to indemnify and hold the Company and all other Shareholders harmless from any damage or liability due to or arising out of a breach of any representation or warranty or covenant in this Subscription Agreement.

# ARTICLE XIV.
## MISCELLANEOUS

      13.1 **Notices.** Notices to the Managing Members shall be sent to the Principal Office of the Company with a copy to The CASE Law Firm, PC, 707 Cinnamon Lane, Franklin Lakes, NJ 07417; Attention: Felix Nihamin, Esq. Notices to the other Members shall be sent to their addresses set forth on Schedule A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 13.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, or mailed first class certified mail, return receipt requested, postage prepaid, or delivered by courier, or sent by facsimile with proof of transmission, to such Members at such address.

      13.2 **Regulations.** The Members shall, from time to time, adopt Regulations relating the conduct of meetings, the election of Managing Members and various other matters.

      13.3 **Headings.** All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

      13.4 **Entire Agreement.** This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

**13.5      Binding Agreement.**  The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

**13.6      Savings Clause.**  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.  If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

**13.7      Counterparts.** The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart.  Any counterpart of either the Agreement shall for all purposes be deemed a fully executed instrument. Digital and electronic signatures shall have the same effect as original ink signatures.

**13.8      Governing Law.**  The Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, exclusive of its principles of conflicts of law.

**13.9      No Membership Intended for Nontax Purposes.**  The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership, either general or limited, under the New Jersey Partnership Law.  The Members do not intend to be partners one to another, or partners as to any third party.  To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

**13.10    No Rights of Creditors and Third Parties under Agreement**.  The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.  The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.  Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**13.11    General Interpretive Principles**.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)      the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)      accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c)      references herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)      a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other sub-divisions;

(e)      the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)      the term "include" or "including" shall mean without limitation by reason of enumeration.

13.12   Dispute Resolution.

(a)      If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through direct discussions within five (5) days after a Member notifies the other Members and/or Managing Members it has a dispute, the Members and Managing Members agree that on the sixth (6th) day after such notice has been delivered (or if the sixth (6th) day is not a Business Day, then on the next Business Day thereafter) to start proceedings to settle the dispute in an amicable manner by mediation administered by the American Arbitration Association (the "AAA") under its Commercial Mediation Rules, before resorting to arbitration.  If all disputes have not been resolved within ten (10) days after the start of such mediation, any Member or the Managing Members may elect to settle any unresolved controversy or claim arising out of or relating to this Agreement, or breach thereof, by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules (except as otherwise provided herein) by written notice to the other Members and Managing Members, as applicable. The Member or Managing Members electing arbitration shall by such notice to the other Members or Managing Members name an arbitrator. The second arbitrator shall be chosen by the noticed Members or Managing Members, as applicable, within ten (10) days after such notice. If the noticed Member or Managing Members does not appoint such second arbitrator, then the AAA shall be requested to submit a list of five (5) persons to serve as the second arbitrator, and the second arbitrator shall be appointed by the first arbitrator from such list within five (5) days of its submission. The two (2) appointed arbitrators shall agree upon the appointment of a third arbitrator within five (5) days after the second arbitrator is appointed. If the two (2) arbitrators so appointed do not agree upon a third arbitrator, then the AAA shall be requested to submit a list of five (5) persons to serve as the third arbitrator. The parties to the arbitration shall select the third arbitrator from the list submitted within five (5) days of its submission; provided that if the parties to the arbitration cannot agree upon the third arbitrator, then the arbitrator shall be selected from

the list of five (5) through the process of each of the first two (2) arbitrators in turn striking names from the list until one (1) name remains.

(b)  The decision of any two (2) of the arbitrators shall be final and binding upon the Members and Managing Members. The arbitrators shall determine the rights and obligations of the Members and Managing Members according to this Agreement and the substantive laws of New Jersey. The parties hereby agree that in any such arbitration each Member and Managing Members shall be entitled to discovery of the others as provided by New Jersey statutes pertaining to civil procedure; provided, however, any such discovery shall be completed within four (4) months from the date of the selection of the second arbitrator, unless such period is extended by agreement of the affected Members and Managing Members or by order of the arbitrators, and any disputes concerning discovery shall be determined by the arbitrators with any such determination being binding on the Members and Managing Members.  The arbitrators shall be requested to render an opinion within fifteen (15) days after the date that discovery is completed.  The arbitrators shall apply New Jersey substantive law and New Jersey evidentiary law to the proceeding.  The arbitrators shall have the power to grant all legal and equitable remedies and award compensatory damages provided by New Jersey law. The arbitrators shall be bound by the terms of this Agreement and shall not be empowered or authorized to add to, subtract from, delete or in any other way modify the terms of this Agreement. The arbitrators shall prepare in writing and provide to the parties an award including factual findings and the reasons on which the decision is based. The decision of the arbitrators shall be final and binding on the Members and Managing Members and judgment thereon may be entered by any court having jurisdiction. In any arbitration or action to interpret or enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs.

**(INTENTIONALLY LEFT BLANK – SIGNATURE PAGES TO FOLLOW)**

## [COUNTERPART SIGNATURE PAGES]

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the Effective Date.

**NON-MANAGING MEMBER(S):**

IFMK REALTY II, LLC
A Nevada Limited Liability Company

By:_____
Iosif Fodymanov
Member

**MANAGING MEMBER(S):**

Atlantic Property Development, LLC
A New Jersey Limited Liability Company

By: Crowne Acquisitions, LLC
Its Managing Member

By:_____
Francis M. Ferrari
Sole Member

**EXHIBIT A**
**<u>BUDGET</u>**

Land cost                                   $  440,000.00

Design, Construction and Improvement        <u>$  260,300.00</u>

Total                                       $  700,300.00

**SCHEDULE A**
**MANAGING MEMBERS**

| Names | Initial Capital Contributions | Units | Sharing Ratio |
|---|---|---|---|
| Atlantic Property Development, LLC | $260,300.00 | 372 | 37.2% |
| | | | |
| | | | |
| | | | |
| TOTALS | $260,300.00 | 372 | 37.2% |

2

## NON-MANAGING MEMBERS

| Names | Initial Capital Contributions | Deadline for Contribution | Units | Sharing Ratio |
|---|---|---|---|---|
| IFMK Realty II, LLC | $440,000.00 | Upon Signing of this Agreement* | 628 | 62.8% |
| TOTALS | $440,000.00 | | 628 | |

3